IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MIMI MY HUONG LE,<br><br>                     Petitioner,<br><br>vs.<br><br>DEBORAH K. JOHNSON, Warden,<br>Central California Women's Facility,[1]<br><br>                     Respondent. | No. 2:12-cv-1845-JKS<br><br>MEMORANDUM DECISION |

Mimi My Huong Le, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Le is currently in the custody of

the California Department of Corrections and Rehabilitation and is incarcerated at the Central

California Women's Facility.  Respondent has answered, and Le has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On May 23, 2007, Le was charged with two counts of murder in the first degree and one

count of conspiracy to murder, with ten overt acts alleged, in connection with the fatal shooting

of the wife and unborn child of her boyfriend, Nai Saechao.  The information further alleged that

the murders were committed with the special circumstances of lying in wait and involving

multiple victims.  Le entered a plea of not guilty to all counts and denied the special allegations.

She maintained that she had been unaware that Saechao was planning to have his wife murdered.

---

[1]        Deborah K. Johnson, Warden, Central California Women's Facility, is substituted
for Walter Miller, former Warden, Valley State Prison for Women.  FED. R. CIV. P. 25(c).

On direct appeal, the California Court of Appeal summarized the facts and allegations

underlying the charges against Le:

> The facts surrounding the shooting are undisputed.  Neither [Saechao] nor [Le]
> was present.  [Saechao] had recruited his cousin, Khae Saephanh, to kill his wife Si.  On
> December 29, 2005, Khae, [co-defendant Lo Fou Saephanh], and the 14-year-old shooter
> (Xeng Saetern) drove to Si's place of employment and waited until she got off work.  The
> young marksman walked down to her car and shot her in the head and abdomen at close
> range while the other two waited in the car.  Si and her four-month-old fetus both died at
> the scene.  Nai Saechao pled guilty to murder and was sentenced to life in prison without
> the possibility of parole.  He testified on behalf of the defense.  After entering into a plea
> agreement for a four-year prison term, Khae's brother, Cheng Saephanh, testified for the
> prosecution.
>
> [Le] testified at trial; . . . [w]e will begin with the story [Le] told the jury. . . .
>
> In January 2005 [Le], a recently divorced young mother of two, sought a casual
> sexual relationship with her coworker [Saechao].  In June she had her IUD removed with
> the doctor's assurance she had a six-month period during which she would not become
> pregnant.  She discovered that she was pregnant with [Saechao's] baby the following
> month.  She testified she did not love [Saechao], never intended to marry him, and only
> hoped he would support his baby.  The love letters [Le] wrote to [Saechao] in jail, she
> insisted, were a lie and a ruse to prevent him from committing suicide and to make him
> feel better.  After [Saechao] told his wife Si about his affair, he asked [Le] to get an
> abortion, a request she deeply resented, and the two parted for a couple of months before
> restarting their dalliance.  [Le] complained that Si called her a "bitch" and a "whore,"
> criticized her for having sex with a married man, and called her frequently on her cell
> phone.
>
> [Le] insisted she knew nothing of [Saechao's] plan to murder his wife.  She
> admitted she asked her brother for a gun, but if she said it was for [Saechao's] wife, she
> was only joking.  She explained she needed a gun because her ex-husband had been
> threatening her.  She denied asking her ex-husband, his cousin, or a friend for a gun.  She
> eventually admitted buying bullets at [Saechao's] request, but she testified he did not tell
> her what they were for and she dutifully performed errands for him whenever he asked.
> Had she known [Saechao] was planning a murder, she assured the jury, she would have
> called the authorities.
>
> Needless to say, the prosecution presented a very different portrait of [Le] to the
> jury.  The prosecution rejected the notion that [Le] had a casual, fleeting relationship with
> [Saechao], demurring to him whenever asked to run his errands and oblivious to the fact
> he was plotting to have his wife murdered.  The evidence the prosecution presented was
> indeed compelling.
>
> The news of [Le's] pregnancy in the summer of 2005 appears to have triggered
> the tragedy that followed six months later.  Si, distraught that her husband was going to
> have a child by another woman, favored an abortion; as did [Saechao].  [Le] refused to

abort.  She was angry [Saechao] would ask her to abort and disappointed that he did not attend doctor appointments with her.  She called Si at least 85 times.  There were no calls from Si's phone to [Le's].  Two of the text messages sent from [Le's] phone to Si's said, "[I]t's a girl."  By October she and [Saechao] were asking relatives, friends, and coworkers for a gun.

[Le] asked her brother for a gun ostensibly because her ex-husband was threatening her.  When her brother rejected her justification, she told him it was for "[Saechao's] wife."  When he asked her why [Saechao] did not get a divorce, she explained there were cultural issues.  Her ex-husband, his cousin, and a friend all testified she asked them for a gun in November and December.  Darrell Emery testified she visited him twice in one week in November or December trying to get a gun from him.  [Le] claimed all three were lying.  She continued to allow her four year old and two year old to visit their dad in spite of her allegations that he was physically abusive, particularly when he was drunk.

On December 26, three days before the murder, [Saechao] asked [Le] to purchase some bullets for him at Big 5; she did.  But she lied to the investigators and said she had never purchased the bullets.  She eventually admitted the purchase but insisted she had no idea [Saechao] was going to use them to have his wife killed.  Although she did not ask him why he needed the bullets, she believed he wanted them to help celebrate New Year's Eve.  It turned out the bullets she bought were the wrong size for the gun [Saechao] had acquired.

Telephone contact between [Le] and [Saechao] in the month of December was intense.  [Le] called [Saechao] 422 times.  On the day of the murder, [Le] and [Saechao] exchanged nine calls.

The phone calls continued after the murder and before [Saechao's] arrest.  From December 30, 2005, through January 26, 2006, there were 367 calls from [Le's] phone to [Saechao's] phone and 251 calls from [Saechao] to [Le].

[Le's] love letters to [Saechao] following the murder belied her testimony that she did not have a serious relationship with him and certainly never envisioned a future together.  On February 15, 2006, she wrote: "You've made me so happy when you asked me to marry you.  I keep thinking that you're kidding about it.  I think when we get out we're going to change your mind.

"You know that after my first marriage I never wanted to get married again.  But nobody has ever—underlined—loved me like you do.  No one has ever showed me love like this.  I'm so happy I have you [ ] in my life.

"When you get out I want to know if you would take guardianship over my kids.  I told Alyssa you're going to be her step-dad and she asked me if she could call you Daddy.  I told her that it's up to her—whatever she feels.

"I love you so much.  For the rest of my life I want to be there for you.  I'm here for you because I owe you everything.  If you hadn't come in my life, I don't know where I would be . . . ."

3

On February 20 she continued with the same promises of unending love and devotion.  She wrote, in part: "You are my heart, my soulmate, my one and only true love.  You mean the whole world to me.  I love you more than life itself . . . .

"If this takes one week, one month, one year or 20 years, I will always be by your side through thick and thin.  With both of us we can make it through anything.  Our love will get us through this.

"I miss you so much.  But I know you and I will both come out of this a hundred times better than before.  Nothing can stop our love.  When you get out our family will be complete . . . .We will both work our ass off to get another house that is bigger and better.  We'll get new better cars.  We'll get everything we've ever wanted.

"But mostly important we will all have each other.  The kids will all be happy and so will we.  I love you so much.  I will do anything you ask and much, much more.  You can depend on me for whatever you need."

[Le] reiterated the same themes again and again.  On March 12, for example, she again proclaimed: "Hey, love, it's me.

"Well, it's almost midnight and I can't go to sleep.  I keep thinking about you how lucky me and the kids are to have you in our lives.  You are the best Daddy, friend, lover, boyfriend, fiancé, future husband, and person that I have ever known.  I grow more and more in love with you each and every day."

At the same time [Le] was professing her love to [Saechao] and envisioning their lives together in the future, she was spending his money, driving his truck, and gambling.  [Saechao] gave her a power of attorney but testified he did not know she was gambling with his savings.

The police found no evidence that Si was having an affair before she was killed.

There are no brother's or sister's keepers in this story.  When [Le's] brother, who himself was in jail at the time, heard about Si's death, he contacted the authorities and told them he believed his sister might have something to do with the murder.  He agreed to have a conversation with his sister taped.

At the conclusion of a jury trial, the jury convicted Le on all counts and found all the special allegations to be true.  On October 12, 2007, the court denied Le's motion for a new trial.  The court then sentenced Le to life imprisonment without the possibility of parole on count one (the murder of Saechao's wife) and a consecutive imprisonment term of 15 years to life on count two (the murder of the unborn fetus).  The court imposed two additional years of imprisonment pursuant to California Penal Code § 12022(a)(2) for acting as a "principal in the commission of a felony or attempted felony if one or more of the principals is armed with an assault weapon."  On

count three (conspiracy to murder), the court sentenced Le to an imprisonment term of 25 years

to life, which was stayed pursuant to Penal Code § 654(a).[2]  The court further imposed various

restitution fines and ordered Le to comply with the forensic sample requirements under Penal

Code § 296.

Through appointed counsel, Le appealed her conviction to the California Court of

Appeal.  Le raised twelve claims of error, asserting that all convictions should be reversed

because they were unsupported by legally sufficient evidence, that the trial court committed six

reversible errors with regard to jury instructions, that she was deprived of effective assistance of

trial counsel, that the trial court abused its discretion in admitting certain evidence, that she had

been subjected to cruel and unusual punishment, and that the parole revocation fine should be

stricken.  In an unpublished, reasoned decision, the Court of Appeal struck the parole revocation

fine but otherwise affirmed the judgment of conviction against Le in all other respects.  Le

petitioned for review to the California Supreme Court, which was denied without comment on

August 10, 2011.

Proceeding *pro se*, Le filed a petition for a writ of habeas corpus to the state superior

court, claiming that the prosecutor committed misconduct during closing arguments, the

admission of recorded interviews violated her right to counsel and her right against self-

--------

[2]     That section provides, "An act or omission that is punishable in different ways by
different provisions of law shall be punished under the provision that provides for the longest
potential term of imprisonment, but in no case shall the act or omission be punished under more
than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for
the same act or omission under any other."  CAL. PENAL CODE § 654(a).  Because a defendant
may not be punished for both murder and the conspiracy to commit the murder, *People v.
Hernandez*, 69 P.3d 446, 464 (Cal. 2003), Le's sentence for the conspiracy to commit murder
conviction was stayed.

incrimination, the court's admission of "bias" testimony from her ex-husband violated her due process rights, she received ineffective assistance of counsel, and the trial court erred in admitting testimony from her brother.  The superior court denied Le's petition in an unpublished, reasoned decision.  Le raised these same claims in a habeas petition to the state supreme court, which was summarily denied on February 2, 2010.

Le timely filed a petition for a writ of habeas corpus to this Court on July 5, 2012.

## II. GROUNDS/CLAIMS

In her *pro se* Petition, Le asserts fifteen grounds for habeas relief, including claims that: 1) the admission of recorded interviews with an investigator violated her right to counsel and right against self-incrimination; 2) the admission of "bias" testimony from her ex-husband violated her due process; 3) her trial counsel was ineffective for failing to hire a pre-trial investigator or conduct a reasonable pre-trial investigation; 4) the admission of her brother's testimony violated her constitutional rights; 5) there was legally insufficient evidence that she aided and abetted the "actual perpetrator"; 6) there was legally insufficient evidence to support her conviction for conspiracy to commit murder; 7) the trial court gave an erroneous instruction which impermissibly allowed the jury to find her guilty of murder with special circumstances based on conspiracy to murder; 8) the trial court erred in failing to give a limiting instruction against the "dominant" personality and character trait evidence against her; 9) her trial counsel was ineffective for failing to object and request a limiting instruction "to counter the prosecutor's improper reliance on personality and character trait evidence"; 10) the trial court erred in giving the jury a consciousness of guilty instruction; 11) the trial court erred in giving a jury instruction

that impermissibly allowed the jury to reject Le's trial testimony based on false statements she made prior to trial; 12) the trial court erroneously failed to give accomplice instructions for co-defendant Lo Saephanh; 13) the trial court erroneously instructed the jury that Cheng Saephanh was an accomplice as a matter of law; 14) the trial court abused its discretion and violated Le's constitutional rights in admitting a photograph of the deceased fetus; and 15) the imposition of life imprisonment without the possibility of parole constituted cruel and/or unusual punishment in Le's case.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

7

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A state court is not required to give reasons before its decision can be deemed to be "adjudicated on the merits." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011). Where there is no reasoned state-court decision denying a claim presented to the state, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)). Where the presumption applies, this Court must perform an independent review of the record to ascertain whether the state court decision was "objectively unreasonable." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (quoting *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir 2005) (per curiam)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

1.    *Evidentiary Errors* (claims 1, 2, 4, 14)

Le first challenges her conviction and imposed sentence by asserting a laundry list of alleged evidentiary errors.

A.    *Claim 1.  Recorded interviews with an investigator.*

First, Le argues that the trial court's admission of secretly recorded interviews between Le and the District Attorney investigator violated her Fifth and Sixth Amendment rights.  Le contends that the investigator should have informed her that the interview was being recorded so that she "could have made an informed decision whether to go forward with the interview or to consult an attorney."  Le argues that the investigator's failure to do so renders her statements during the interview involuntary.  The state superior court considered and rejected this claim on habeas review, citing Penal Code § 633 and state case law to conclude that "the anti-wiretapping provisions of §§ 630-632 do not apply to law enforcement officers, such that a district attorney investigator is permitted to overhear or record any communications that they could lawfully overhear or record prior to 1967."  Le also raised this claim in her habeas petition to the state supreme court, which was summarily denied.

In her Petition before this Court, Le argues that the recordings of her conversations violated her Fifth Amendment right against self-incrimination because the conversations constitute a custodial interrogation during which she had the right to presence of her counsel.  A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Although she states that Saechao was arrested by this time, Le offers no evidence suggesting that she was in custody when the conversations were recorded nor does she contend that her freedom of action was restricted in any significant matter at that time.  Her Petition instead states that the police "did not arrest [Le]" and that "the investigation continued as to her."  The record further reflects that the investigator went to Le's home, where she was allowed into the home by Le, and left Le's home

9

after each conversation.  Accordingly, because she was not in custody when the interviews were

recorded, the recordings cannot constitute a "custodial interrogation," and Le's *Miranda*

argument must be rejected.

Furthermore, the interviews did not implicate the Sixth Amendment right to counsel.  The

right to counsel does not attach until "after the initiation of formal charges."  *Moran v. Burbine*,

475 U.S. 412, 431 (1986).  In this case, the recordings of the conversations at issue occurred on

February 18, 2006, and July 13, 2006, long before Le was formally charged on May 23, 2007.

The recordings therefore did not violate Le's Sixth Amendment right to counsel, and Le is not

entitled to relief on either argument advanced in her first claim.

B.     *Claim 2.  Testimony from Le's ex-husband.*

Le next claims that the trial court violated her due process rights by allowing "bias"

testimony from her ex-husband.  The superior court likewise rejected this claim on habeas

review, stating:

> [Le] also claims that the court violated her Fourteenth Amendment rights by
> allowing "bias" testimony from her ex-husband Rusu.  Her basis claim appears to be that
> Rusu should not have been allowed to testify because they had marital problems which
> might have led him to slant his testimony against her.
> [Le] cites no authority for the proposition that a witness should be precluded from
> testifying in a criminal case merely because the witness has a contentious relationship
> with the defendant.  Rather, [Le] had the opportunity to cross-examine her ex-husband
> while he was on the witness stand and to present evidence to challenge his credibility.  As
> such, this claim is without merit and is denied.

Le asserts that, because she and the prosecution's witnesses all agreed that Le and her ex-

husband were "not friendly," her ex-husband's testimony was biased against Le and should have

been excluded because its probative value was substantially outweighed by the risk of undue

prejudice.  It appears that Le contends that the trial court should have excluded his testimony

under the California Evidence Code, which grants courts discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  CAL. EVID. CODE § 352.

States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials.  *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006).  "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury.  The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate."  *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding that due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needless presentation of cumulative evidence."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."  *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).  California employs a similar rule.  *See People v.*

*Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights. *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

Le's conclusory assertion that the admission of her ex-husband's testimony violated her due process rights is insufficient to raise an issue of constitutional dimension. *See Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner cannot transform a state-law issue into a federal one by simply asserting a due process violation).  Even assuming that Le could demonstrate that, contrary to the state court's conclusion on habeas review, the testimony was overtly prejudicial, she still cannot prevail on this claim.  "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  "Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.* (citing *Williams*, 529 U.S. at 375).  Absent such "clearly established Federal law," it cannot be

concluded that the appellate court's ruling was an "unreasonable application."  *Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a claim, a federal court cannot find a state court ruling unreasonable).  Accordingly, this evidentiary claim is without merit.

   C.   *Claim 4.  Testimony from Le's brother.*

   Le additionally claims that her brother should be allowed to "re-address the court" due to his submission after trial of a sworn affidavit that Le contends amounts to recanted testimony and newly discovered evidence that "would likely result in an acquittal."  In support of her claim, Le provides as an exhibit a letter from her brother stating that he was "not in the right frame of mind" during trial to make such statements against Le and stating that he would like to "resubmit" his statements against his sister.  On habeas review, the state superior court found that the affidavit was not a recantation because it "does not contain any statement that [the brother] provided any false testimony" and that it was insufficient to undermine the judgment because it "does no more than conflict with trial evidence."  The superior court concluded, "In short, not only is the attached statement of Duc Le not a 'recantation,' but it also does not come close to casting fundamental doubt on the accuracy and reliability of the proceedings."

   Again, the Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."  *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution."  *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).  Although she states in conclusory fashion that the admission of her brother's testimony "substantially violated [her]

Constitutional Amendment rights," Le fails to demonstrate any such violation, and, as previously

noted, she cannot transform her state-law evidentiary claim into a federal one merely by asserting

a violation of due process.  *See Langford*, 110 F.3d at 1389.  Le is therefore not entitled to relief

on this claim.

        D.     *Claim 14.  Photograph of deceased fetus.*

Le further contends that the trial court abused its discretion and violated Le's Sixth and

Fourteenth Amendment rights and her right to a fair trial by admitting over defense objection and

displaying to the jury an autopsy photograph of a dead fetus.  Le claims that the photograph was

irrelevant because it was undisputed that the fetus had reached the requisite gestational age, and

the defense had offered to stipulate as to the issue of fetal development.  Le raised this claim on

direct appeal.  The court agreed with Le that the trial court abused its discretion by admitting

irrelevant evidence but nonetheless denied Le's claim for relief after concluding that the error

was not prejudicial.  The court reasoned:

> Of course the view of the fetus may have evoked a strong emotional response from some
> of the jurors.  Indeed, as [Le] points out, one alternate juror had expressed her aversion to
> seeing such a photograph before trial.  But she was reassured the fetus had not sustained
> any mortal wounds.  The photograph may have been irrelevant, and indeed cumulative to
> the medical testimony, but it did not convey anything the jurors did not already know.
> There was nothing about this particular photograph that was unduly graphic or disturbing
> beyond the tragic fact of the death itself.  Therefore, we conclude that it is not reasonably
> probable that, in the absence of the photograph, [Le] would have received a more
> favorable verdict.

"When reviewing the effect of an erroneous evidentiary ruling, we begin with a

presumption of prejudice. 'That presumption can be rebutted by a showing that it is more

probable than not that the jury would have reached the same verdict even if the evidence had

[not] been admitted.'"  *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1159

(9th Cir. 2010) (quoting *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005)).  To warrant reversal of a jury verdict on the basis of evidentiary error, the trial court's error must have "more probably than not . . . tainted the verdict."  *United States v. 4.85 Acres of Land, More or Less, Situated in Lincoln Cnty.*, 546 F.3d 613, 617 (9th Cir. 2008).

As an initial matter, even if the trial court abused its discretion in admitting the photograph that fact is insufficient to warrant habeas relief.  Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.[3]  Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.  *Renico v. Lett*, 559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have done so–the applicable standard on direct review.  The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was 'an unreasonable application of . . . clearly established Federal law.'" (quoting § 2254(d)(1))).

Moreover, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable."  *See Fry v. Pliler*, 551 U.S. 112, 119

---

[3]     At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error.  *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000).  This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard.  *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc).  The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as inappropriate under the AEDPA.  *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

(2007).  Given the amount of evidence against Le in the record, the court's determination that the admission of the photograph of the fetus was not prejudicial is not unreasonable.  *See Ponce v. Felker*, 606 F.3d 596, 606 (9th Cir. 2010) (on habeas review, determining that where there was "weighty evidence against Petitioner independent of" the erroneously-admitted statements, "it was not unreasonable for the state courts to determine that the additional testimony . . . did not have a 'substantial and injurious effect or influence in determining the jury's verdict'" (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993))).  Accordingly, Le cannot prevail on this evidentiary claim.

2.      *Ineffective Assistance of Counsel* (claims 3, 9)

Le next contends that trial counsel was ineffective for a variety of reasons.

B.      *Claim 3: Failure to investigate, failure to prepare Le to testify at trial, and failure to object to certain testimony.*

Le first argues that trial counsel was ineffective for failing to hire an investigator or conduct an adequate pre-trial investigation.  Le claims that such measures would have revealed: 1) the existence of police records showing that Le was threatened by her ex-husband during 2005; 2) that Le and her ex-husband did not share custody of their children, contrary to her ex-husband's testimony; 3) character witnesses who could testify as to her strained relationship with her ex-husband; and 4) that she paid Saechao's bills while he was in jail, contrary to prosecution's assertions that she squandered Saechao's money.  She further asserts with respect to claim 3 that trial counsel was ineffective for failing to prepare Le to testify at trial, failing to object to the admission of Le's taped conversations with the District Attorney investigator, and failing to object to the testimony of Le's ex-husband.

16

The state superior court denied all claims of ineffective assistance of counsel on habeas review.  As to Le's failure to investigate claims, the court determined that Le did not attach "any reasonably available documentary evidence or affidavits in support of her 'failure to investigate claims'" and "failed to explain or allege how the alleged failure to investigate was unreasonable in light of the actual defense pursued."  The court also rejected her claim that counsel was ineffective in failing to prepare her for testifying at trial, noting that Le "fail[ed] to allege whether trial counsel knew her intention beforehand that she desired to testify or whether counsel attempted to persuade her not to testify" and did not state "how any preparation undertaken would have resulted in her testifying any differently so as to have made a difference in the outcome of the trial."  The court further rejected her failure to object claims because it had determined that the admission of Le's taped conversations and her ex-husband's testimony was proper.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*  The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Thus, Le must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability

17

that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

> In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:
>
> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d) standard. *See Knowles*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

None of Le's claims have merit when viewed in light of these standards. As to her failure to investigate claims, Le fails to demonstrate that a different verdict would have been rendered if counsel had obtained the evidence she argues should have been uncovered, particularly given the evidence against her. She therefore cannot show that any purported failure to investigate caused her prejudice. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one). She also cannot demonstrate prejudice with respect to her claim that counsel was ineffective for failing to adequately prepare her to testify because she does not proffer any information on how she would have testified differently or how the outcome would have been different had she been better prepared. Nor can she establish prejudice due to counsel's failure to object to the admission of the tape recorded evidence and her ex-husband's testimony because, as discussed above, those items were properly

admitted.  *See Lockhart v. Fretwell*, 506 U.S. 364, 374 (1993) (O'Connor, J., concurring) (failing to raise a meritless objection cannot constitute prejudice under a *Strickland* ineffective assistance of counsel claim).  Accordingly, Le is not entitled to relief on any arguments raised in this claim.

      C.    *Claim 9: Failure to counter personality and character trait evidence.*

Le argues that trial counsel was also ineffective for failing "to object and request instructions to counter the prosecutor's improper reliance on personality and character trait evidence [which] violated [her] 6th and 14th Constitutional Amendment rights as well as her due process right to a fair trial."  The state appellate court rejected this claim on direct appeal of her conviction:

> Central to [Le's] appeal is her belief that she was unfairly convicted of murder and conspiracy because the prosecutor improperly portrayed her to the jury as a dominating, evil woman who spearheaded the plot to murder [Saechao's] wife and improperly urged the jury to infer guilt from the personality evidence.  In the next version of the same theme, she complains that her lawyer did not shield her from the improper use of the character evidence by objecting to the evidence in the first place and then failed to contain the damage by requesting a limiting instruction, objecting to the prosecutor's argument, requesting the court to admonish the jury to disregard the impermissible argument, and objecting to the prosecutor's continued reliance on the same evidence in opposition to the motion for a new trial.  She fails to sustain her burden of proving her lawyer's representation fell below an objective standard of reasonableness.
>
> This case is a vivid reminder of the huge chasm between the story advocates tell in their briefs and the story the record tells.  It is true the prosecutor attempted to persuade the jury the persona [Le] presented was a fake.  In his view, the evidence did not support her pretrial statements and trial testimony about the nature of her relationship with [Saechao] as we have discussed at some length above.  But this was only one of many arguments the prosecutor made and by far one of the least important.  The thrust of his case was not her personality, but what she did and said: she tried to obtain a gun she said was "for [Saechao's] wife" and she bought bullets at [Saechao's] request.  Simply put, [Le] exaggerates the role of the so-called character or personality evidence in this case.
>
> That being said, the prosecutor did rely on hours of taped telephone conversations between [Saechao] and [Le] to discredit [Le], the witness.  [Le] contends her lawyer should have objected to the admissibility of the tapes and his failure to do so deprived her of her constitutional right to adequate representation.  We disagree.

"An attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel. [Le's] lawyer, like us, may have been more focused and more concerned about her overt actions than the nuances of the lovebirds' daily chit-chats. [Le's] criminal liability was the same whether she controlled the conspiracy or merely participated in it. Thus, her lawyers could have made the imminently reasonable tactical decision not to object to the admissibility of the evidence, particularly when it was likely to be admitted as evidence of motive.

Nor do we find her lawyer fell short in failing to react to the prosecutor's argument, either by objecting, asking for an admonition or limiting instruction, or starting it all over again at the motion for a new trial. Appellate counsel attributes far more significance to this one strain of argument than we believe is justified by a reading of the whole record. If, as we conclude, the telephone conversations were played for the jury to vividly demonstrate that the nature of her relationship with [Saechao] was at odds with how she represented it before and during trial and thereby to undermine her credibility, then defense counsel could tactically decide to minimize the impact by essentially ignoring it. In any event, the evidence was relevant and the prosecutor's interpretation of it was reasonable. Thus, an objection would have been overruled. [Le's] ineffectiveness claim fails.

As the state court reasonably concluded on habeas review, Le fails to demonstrate that an objection, had it been made, would have been sustained as to any of this evidence. Further, a fair reading of the record and trial transcript demonstrates that the prosecutor did not unfairly focus on any of Le's character traits in an effort to bias the jury but, rather, in the course of presenting evidence, certain characteristics were revealed. As the state court noted, there was nothing improper about the prosecutor's case in this regard and, therefore, Le's arguments to the contrary must be also rejected here.

3.     *Legally Insufficiency of the Evidence* (claims 5, 6)

Le additionally claims that the convictions against her were not supported by legally sufficient evidence.

A.     *Claim 5. Aiding and abetting.*

First, Le claims that there was insufficient evidence to establish that she aided and abetted the murder because the prosecution argued that Le aided and abetted Saechao rather than the 14-year-old shooter, who Le claims "was the actual perpetrator who shot and killed" Saechao's wife. The state appellate court considered and rejected her claim on direct appeal, finding no support for Le's contention that the prosecution's failure to establish that she aided and abetted the shooter required reversal of the two murder convictions.

Under California law, aiding and abetting is not a crime in itself, but rather is a theory of liability. *People v. Gonzales*, 281 P.3d 834, 870 (Cal. 2012). California law provides that one who aids and abets a crime is considered a principal in the crime and is guilty to the same extent as any other principal, including the actual perpetrator. CAL. PENAL CODE § 31; *People v. McCoy*, 24 P.3d 1210, 1214 (Cal. 2001). An aider and abettor is guilty of the crime when he intends to encourage or facilitate the actual perpetrator in the commission of the crime. *McCoy*, 24 P.3d at 1214. Murder is an unlawful killing with malice aforethought. CAL. PENAL CODE § 187(a).

At Le's trial, the prosecutor made clear that, while the prosecution relied on an aiding and abetting theory of liability with regards to Le's co-defendant Lo Saephanh, the driver of the getaway car, it was pursuing a conspiracy theory against Le. Because the prosecution did not rely on an aiding and abetting theory to convict Le of murder, it is irrelevant whether there was sufficient evidence to establish that she aided and abetted the shooter.

As the California Court of Appeal has explained:

> The doctrine of conspiracy plays a dual role in [California] criminal law. First, conspiracy is a substantive offense in itself–an agreement between two or more persons that they will commit an unlawful object (or achieve a lawful object by unlawful means),

21

and in furtherance of the agreement, have committed one overt act toward the achievement of their objective.  Second, proof of a conspiracy serves to impose criminal liability on all conspirators for crimes committed in furtherance of the conspiracy.  Thus, where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine.  In contemplation of law the act of one is the act of all.

*People v. Salcedo*, 35 Cal. Rptr. 2d 539, 30 Cal. App. 4th 209, 215 (Cal. Ct. App. 1994)

(citations and internal quotation marks omitted).

Le was therefore properly charged with conspiracy to commit murder as a separate offense as well as with murder based on a conspiracy theory.  The jury's finding that Le conspired to commit murder with regards to count three necessarily dictates that the jury found that Le was a member of the conspiracy.  As discussed further with regards to claim 6, *infra*, that conclusion was supported by legally sufficient evidence.  Because there was legally sufficient evidence to support the jury's verdict that Le conspired to commit murder and murder was actually committed by a co-conspirator, Le's convictions for murder in counts one and two likewise are supported by legally sufficient evidence.  She is therefore not entitled to relief on this claim.

B.      *Claim 6.  Conspiracy to commit murder.*

Le likewise contends that her conviction for conspiracy to commit murder is unsupported by substantial evidence because there was no evidence that Le had knowledge of Saechao's plan and the prosecution's case "was built upon suspicion and personality/character trait evidence, which is a legally insufficient basis to sustain a criminal conviction."  On direct appeal of her conviction, the state appellate court disagreed with Le's contentions:

We reject [Le's] attempt to degrade powerful circumstantial evidence to mere suspicion and speculation.  The facts of the cases she cites highlight the crucial distinction between circumstantial evidence of reasonable, credible, and solid value and flimsy evidence based on mere suspicion or speculation.

We will first examine the circumstantial evidence in the light most favorable to the verdict that [Le] agreed to help [Saechao] with the knowledge he was planning to murder his wife and with the specific intent to assist him reach that objective.  Perhaps the most compelling evidence are the overt acts she took to further the conspiracy; that is, her repeated attempts to obtain a gun and her purchase of the bullets.  She offers innocent explanations for her actions, explanations, of course, the jury was free to reject, particularly in light of the fact she lied to investigators and denied ever purchasing the bullets.  Since she and [Saechao] were canvassing friends and family for a weapon at the same time they maintained their extramarital affair and she expressly told her brother the gun was "for [Saechao's] wife," it strains credulity to believe she had no idea of his plan to murder Si.

[Le's] professions of love and visions of a happily-ever-after ending, exposed in her voluminous letters, certainly belied the nonchalant attitude toward [Saechao] she tried to convey during the investigation and at trial.  Again, given her duplicity, the jury was free to infer an obvious motive to get rid of the woman who threatened to derail her fairy tale.

The phone trail strengthened the prosecution's case.  Not only did the police officer demonstrate the extraordinary number of calls between [Le] and [Saechao] in the month before and after the murder, suggesting an intensity in the relationship at odds with [Le's] testimony, but he also carefully documented the timing of the calls in relationship to the calls [Saechao] made to his coconspirators on the day of the murder.  Standing alone, the telephone records may not have produced a conviction, but when taken with all the other evidence, they bolstered the inference that [Le] was indeed a vibrant participant in a conspiracy to kill.

A conviction for conspiracy requires proof of four elements: (1) an agreement between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy.  CAL. PENAL CODE § 182(a)(1); *People v. Bogan*, 62 Cal. Rptr. 3d 34, 36-37 (Cal. Ct. App. 2007). "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction."  *People v. Bloom*, 774 P.2d

698, 705 (Cal. 1989).  Intent may also be "inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy."  *People v. Herrera*, 98 Cal. Rptr. 2d 911, 922 (Cal. Ct. App. 2000) (internal quotation marks and citations omitted).

Le misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction.  As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the Calfornia court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  A fundamental principle of our federal system

is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, the role of this Court is to simply determine whether there is any evidence, if accepted as credible by the jury, sufficient to sustain conviction.  *See Schlup v. Delo*, 513 U.S. 298, 330 (1995).  In this case, the Court of Appeal determined that there was sufficient evidence of each element of criminal conspiracy, as defined in California law, to support Le's convictions.  Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Le bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous.  28 U.S.C. § 2254(e)(1).  She has failed to carry such burden. The evidence in the record, as articulated by the Court of Appeal, does not compel the conclusion that no rational trier of fact could have found proof that Le was guilty of these crimes, especially considering the double deference owed under *Jackson* and the AEDPA.  Accordingly, Le is not entitled to relief on this legal insufficiency claim either.

4.      *Jury Instruction Errors* (claims 7, 8, 10, 11, 12, 13)

Le further contends that the trial court committed a number of alleged errors with respect to jury instructions.  A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record.  *Estelle*, 502 U.S. at 72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn.  *Id.* at 72-73.  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation."  *Id.*   Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.  *See Henderson*, 431 U.S. at 155.  In those cases, the inquiry is whether the trial court's refusal to give

26

the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72.

A.      *Claim 7.  Conspiracy instruction.*

First, Le claims that the trial court erred in giving CALCRIM No. 417 "which allowed the jury to find her guilty of murder with special circumstances based on conspiracy to murder, which is a crime that does not support special circumstances."  In support of her argument, Le cites to the California Supreme Court's decision in *People v. Hernandez*, 30 Cal. 4th at 866, in which the court held that the special circumstances in Penal Code § 190.2 did not apply to the crime of conspiracy to murder.  The Court of Appeal rejected her claim on direct appeal, concluding that the special circumstances were imposed not upon her conviction for conspiracy to murder but on her murder convictions.

Le argues that giving CALCRIM No. 417 "eliminated the prosecutor's burden of proving her a principle [sic] in the crime of murder, either as a perpetrator or as an aider and abetter."  Le again contends that she was prosecuted as a principal to the first degree murder based on an aiding and abetting theory.  As previously discussed, however, conspiracy is both a separate offense and an underlying liability theory, and Le was convicted of first degree murder on a conspiracy theory.  The California Supreme Court has explicitly stated, "One who conspires with others to commit a felony is guilty as a principal."  *In re Hardy*, 163 P.3d 853, 887 (Cal. 2007).  The record therefore supports the appellate court's rejection of her claim, which was neither unreasonable nor contrary to federal law.  Le is therefore not entitled to relief on this claim.

B.      *Claim 8.  Failure to give limiting instruction against personality and character trait evidence.*

Le next argues that, "because personality and character trait evidence was a dominant part of the evidence against her, the court had a sua sponte duty to give a limiting instruction."  The appellate court rejected this claim on direct appeal:

> Because the evidence was relevant to motive, was not unduly prejudicial, and was not a dominant part of the evidence, this is certainly not the occasional and extraordinary type of case necessitating unsolicited judicial intervention.
>
> Not only did [Le] fail to request a limiting instruction, but she also failed to object to the admissibility of the telephone conversations she now complains were misused by the prosecutor in closing argument.  She insists that the substance of these conversations took center stage at trial even though the substance of the conversations did not reveal her knowledge of a conspiracy or her intent to participate in one.  She acknowledges they were relevant to prove motive pursuant to Evidence Code section 1101, subdivision (b) but argues they were only marginally relevant and were highly prejudicial.
>
> Without repeating at length what we have said before, [Le's] repeated attempts to distance herself from [Saechao] were discredited by the sheer number and substance of her conversations with him.  They undercut her credibility and highlighted her motive to help remove the woman who came between her and her man and the lifestyle she coveted.  Moreover, while exposing her duplicity and therefore damaging to her case, the calls were not highly prejudicial.  Nor did they dominate the trial.  They consumed approximately one day of testimony in a 21-day trial and were extremely helpful in proving the nature of her relationship with the man who admittedly conspired to kill his wife.  There is nothing extraordinary about the evidence, or the role it played in this case, to deviate from the well-accepted principle that a trial court does not have a sua sponte obligation to give a limiting instruction on how jurors should use the evidence.

As an initial matter, because defense counsel failed to request the instruction at trial, the claim is procedurally defaulted from federal habeas review under the contemporaneous-objection rule.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment).  The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a

federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).

In any event, Le's claim also fails on the merits. "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the state evidentiary rules.")); *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court."). This Court is bound by the state appellate court's determination that the trial court was not required under California law to *sua sponte* give a limiting instruction in the absence of any due process violation. Le fails to establish a due process violation here because, again, she may not transform her state instructional error claim into a federal claim by simply asserting a violation of her constitutional rights. *See Langford*, 110 F.3d at 1389. Le is therefore not entitled to relief on this claim either.

C.      *Claim 10. Consciousness of guilt instruction.*

Le additionally argues that her due process rights were violated because the "consciousness of guilt instruction erroneously permitted the jury to infer a consciousness of guilt based on the rejection of [her] trial testimony." This claim was also considered and rejected on direct appeal of her conviction:

> An inference of a consciousness of guilt is not the equivalent of a finding of guilt and the plain language of CALCRIM No. 362 merely allows the jury to consider evidence of consciousness of guilt as one factor in determining guilt. Because the instruction

expressly prohibits the jury from relying on that evidence alone to convict, we reject the argument it erroneously allowed the jury to bootstrap disbelief into affirmative evidence of guilt in a manner diluting the prosecutor's burden of proof.

Le fails to demonstrate that the state appellate court's determination was unreasonable or contrary to federal law.  Le does not point to any clearly established Supreme Court precedent prohibiting a trial court from instructing a jury that it may infer consciousness of guilt from a defendant's trial testimony and fails to show that the instruction given to the jury on the evidentiary value of making a false statement so infected the entire trial that her conviction violates due process.  Informing the jury that they could consider a false statement in determining her guilt of the charged crime did not render Le's conviction fundamentally unfair, especially where the jurors were also instructed that it was up to them to determine the meaning and importance of the false statement and that the statement could not, by itself, prove Le's guilt of the charged crime.  *See United States v. Perkins*, 937 F.2d 1397, 1402 (9th Cir. 1991) (finding consciousness of guilt instruction proper because it "does not instruct the jury that the conduct is evidence of guilt; rather, the instruction stresses that false statements may be considered as circumstantial evidence of consciousness of guilt, and that it is up to the jury to determine the significance of the evidence").  Because Le cannot demonstrate that the giving of this jury instruction rose to the level of a due process violation, she cannot prevail on this instructional error claim.

D.    *Claim 11.  Witness credibility instruction.*

Le next contends that CALCRIM No. 226 "erroneously permitted the jury to reject [her] trial testimony based on false statements made prior to trial" in violation of her Sixth Amendment and due process rights.  That instruction provides: "If you decide that a witness

30

deliberately lied about something significant in this case, you should consider not believing anything that witness says.  Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

CALCRIM No. 226.

In rejecting this claim on direct appeal, the appellate court stated:

[T]he instruction allows the jury to disregard all, part, or none of a witness's testimony based on anything bearing on witness credibility.  Nor do we agree that the instruction "urge[s]" the jury to reject all of [a] defendant's testimony.  The instruction does not "urge," it simply allows the jury maximum flexibility to assess the credibility and believability of a witness's testimony.  This is true whether the false statement was made to a police officer during an interrogation or whether it was made under oath at trial.  The jury is entrusted with the responsibility to weigh the significance of the falsehood and the circumstances under which it was made, a responsibility the jury is uniquely equipped to discharge.

Le contends that the witness credibility instruction "erroneously suggested that jurors should consider rejecting her entire testimony based on the fact that she lied to police in unsworn statements made prior to trial."  Le apparently argues that the instruction itself is erroneous because it allows a jury member assessing witness credibility to disregard a witness's trial testimony if he or she finds that the witness lied, regardless of whether the lie occurred in unsworn statements or sworn trial testimony.  However, that argument raises an issue of state law that is not cognizable on federal habeas review.  *Estelle*, 502 U.S. at 71-72.  Le fails to raise an issue of federal constitutional dimension because she identifies no Supreme Court authority that mandates that a jury may disregard a witness's testimony only if the witness lies in sworn statements.  Accordingly, Le is not entitled to relief on this claim.

E.      *Claims 12 and 13.  Accomplice Instructions.*

In claim 12, Le argues that the trial court erred in failing to instruct that co-defendant Lo

Saephanh was an accomplice as a matter of law.  Although Lo Saephanh did not testify, the court

admitted into evidence two interviews he gave to police.  Le contends that the court should have

instructed the jury that Lo Saephanh was an accomplice such that "his statements must be viewed

with caution and must be corroborated."  In claim 13, Le conversely argues that the trial court

erred in instructing the jury that Cheng Saephanh, who testified for the prosecution pursuant to a

plea agreement, was an accomplice as a matter of law.  The appellate court rejected both of these

claims on direct appeal, concluding that Le suffered no prejudice from either the omission or

provision of such instructions:

> Here the testimony offered by Lo and Cheng does not fit the accomplice
> archetype.  Neither accomplice fingered [Le].  Neither testified or told the interrogating
> police officers that [Le] was a member of the conspiracy, that she committed any overt
> acts in furtherance of the conspiracy, or that she aided and abetted the murder.  Rather,
> the connection between their pretrial statements or testimony at trial and [Le] was quite
> attenuated.
> . . . .
>
> [Le] contends the accomplice instruction unfairly tainted her because she, like
> Cheng, had purchased bullets for [Saechao].  She makes what we believe to be the
> unreasonable inference that the jurors would find her an accomplice simply because
> Cheng was identified as an accomplice as a matter of law and both of them bought
> bullets.  We agree with the Attorney General that there is no reasonable probability that
> CALCRIM No. 335 led the jury to infer that [Le] was guilty from Cheng's status as an
> accomplice.
>
> Such an inference would have been at odds with the many instructions
> emphasizing that the prosecution bore the burden of proving that [Le] was a member of
> the conspiracy, including the admonition that "[e]vidence that a person did an act or made
> a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to
> prove that the person was a member of the conspiracy."  Thus, taking the instructions as a
> whole, there is no reasonable probability that the jury would use CALCRIM No. 335 and
> Cheng's accomplice status as a substitute for proof of [Le's] guilt.
>
> Similarly, it is not reasonably probable that the jury would have reached a result
> more favorable to [Le] had it been instructed to view with care and caution Lo's pretrial
> statements.  Lo described what he, Xeng, and Khae did on the night of the shooting, not
> what [Le] said or did.  The evidence against [Le] that she had attempted to secure a gun,

that she bought bullets for [Saechao], that she lied to the police officers, that she had a motive to kill Si because she was in love with [Saechao] and wanted to spend her life with him, and that she talked to [Saechao] through all the critical planning phases did not come from Lo. Any cautionary instruction under these circumstances would have little, if any, impact on the jury's consideration of [Le's] guilt, and the accomplice corroboration requirement only applies to "convictions" for underlying substantive offenses, and not to true findings on enhancement allegations.

As previously stated, an allegation that a jury instruction is incorrect under state law does not form a basis for federal habeas corpus relief. *Estelle*, 502 U.S. at 67. Rather, a habeas court must consider "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process . . . not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Henderson*, 431 U.S. at 154 (citations and internal quotation marks omitted). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Id*.

In this case, the state appellate court reasonably concluded that the jury did not impermissibly use Cheng Saephanh's accomplice status as a substitute for proof of Le's guilt. The court also reasonably concluded that, in light of the evidence against her, Le failed to show that the jury's verdict would have been different had the jury been instructed that Lo Saephanh was an accomplice as a matter of law. Accordingly, Le fails to demonstrate that the state court rejection of her accomplice instruction claims was contrary to, or an unreasonable application of, Supreme Court authority, and the claims must be denied.

5.    *Cruel and Unusual Punishment* (claim 15)

Finally, Le challenges the trial court's imposition of life imprisonment without the possibility of parole as "disproportionately harsh, cruel and/or unusual punishment." She

33

contends that the prosecution's "theory that she was the driving force behind [Saechao] was unsupported by competent evidence." She again claims that there was no evidence that she assisted or supported "the participants in the actual murder." She asserts that, because her sentence was imposed based on convictions not legally supported by sufficient evidence, the sentence is disproportionately harsh. She further contends that her conviction for first degree murder should be reduced to second degree murder.

The trial court rejected Le's contention that the sentence was cruel and unusual when it denied her motion for a new trial after finding that Le was a "driving force behind the conspiracy which resulted in the murders." The state appellate court likewise rejected this claim on direct appeal:

> We disagree with her position that there was no evidence she assumed a leadership position in this operation.
> To the contrary, the trial court, who, like the jurors, listened to her testimony and watched her demeanor, was in a position to assess her credibility. There is ample evidence to support the rejection of the naïve image she attempted to create, particularly in light of the many lies she told about the kind of relationship she had with [Saechao] and her expectations for the future. Moreover, a prosecution witness carefully choreographed the calls she made and received from [Saechao] to demonstrate that she was in close contact during the pivotal planning phases of the murder, particularly in the afternoon hours on the day of the shooting.
> . . . .
> In sum, while the sentence is harsh, we cannot say it shocks our conscience or offends our fundamental notions of human dignity. A self-centered mistress, jealous of the life a wife enjoyed with the mistress's lover, participated in a vicious and brutal plan to have her murdered. There was circumstantial evidence to support the trial court's finding she was a driving force. The court, in summary fashion, indicated that her involvement "in effect" rendered assistance to the others. That is not to say she directly supported the perpetrators, but it is to say she played a major role and an innocent woman was killed because of her. We therefore conclude the sentence did not violate the constitutional proscription against cruel and unusual punishment.

34

The Eighth Amendment, which applies to the States by virtue of the Fourteenth Amendment, *see Robinson v. California*, 370 U.S. 660, 666 (1962), provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Supreme Court has held that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Lockyer*, 538 U.S. at 73 (citation omitted).  The Supreme Court has never categorically held that a mandatory sentence of life without the possibility of parole imposed on adult homicide offenders violates the Eighth Amendment and, in fact, has upheld mandatory life without parole sentences even for non-violent offenders.  *See, e.g., Harmelin v. Michigan*, 501 U.S. 957 (1991) (upholding a mandatory life without parole term for a defendant convicted of possessing more than 650 grams of cocaine).  In this case, the California courts upheld Le's conviction of life without the possibility of parole where Le was convicted of the intentional and unprovoked murders of a woman and her unborn child.  Le's is not "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Ewing v. California*, 538 U.S. 11, 30 (2003) (quoting *Harmelin*, 501 U.S., at 1005 (Kennedy, J., concurring in part and concurring in judgment)).  The California Supreme Court's decision affirming Le's sentence was therefore not "contrary to, or [did not] involve[ ] an unreasonable application of," the gross disproportionality principle, the contours of which are unclear. *Lockyer*, 538 U.S. at 73 (2003).  Accordingly, Le is not eligible for relief on her cruel and unusual punishment claim.

V. CONCLUSION AND ORDER

Le is not entitled to relief on any ground raised in her Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a

certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); Ninth Circuit R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 25, 2013.

/s/James K. Singleton, Jr.

JAMES K. SINGLETON, JR.
United States District Judge